**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:
GECKO PARKS, LLC

                                              Case No.: 20-18973-PDR
                                              Chapter 11

        Debtor-in-Possession.

_____/

**OBJECTION AND SETOFF TO**
**PROOF OF CLAIM #1 FILED BY WESTON 3305 PROPERTY LLC**

**IMPORTANT NOTICE TO CREDITOR:**
**THIS IS AN OBJECTION TO YOUR CLAIM**

        This objection seeks either to disallow or reduce the amount or change the priority status of the claim filed by you or on your behalf. Please read this objection carefully to identify which claim is objected to and what disposition of your claim is recommended.

        If you disagree with the objection and setoff or the recommended treatment, you must file a written response WITHIN 30 DAYS from the date of service of this objection, explaining why your claim should be allowed as presently filed, and you must serve a copy to the undersigned attorney OR YOUR CLAIM MAY BE DISPOSED OF IN ACCORDANCE WITH THE RECOMMENDATION IN THIS OBJECTION.

        If your entire claim is objected to and this is a chapter 11 case, you will **not** have the right to vote to accept or reject any proposed plan of reorganization until the objection is resolved, unless you request an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing your claim for voting purposes.

        The written response must contain the case name, case number, and must be filed with the Clerk of the United States Bankruptcy Court.

Pursuant to Bankruptcy Rule 3007 and Local Rule 3007-1, the Debtor objects to Claim #1 filed by Weston 3305 Property, LLC (the "Landlord") in the amount of $293,884.09, asserts a setoff of $256,716.28, resulting in a reduced allowed claim of $37,167.81, and in support thereof, states as follows:

1.       On August 20, 2020, the Debtor filed for voluntary relief under Chapter 11 of the Bankruptcy Code (DE 1).

2.       The Debtor operates a trampoline and action park (with an arcade and other activities).

3.       On May 25, 2017, Debtor and Landlord entered into a Triple Net Lease (the "Lease"), a copy of which is attached as Exhibit "A" for a ten (10) year term for a 33,000 square foot warehouse space located at 3305 Corporate Avenue, Weston Florida 33331 (the "Leased Premises").

4.       The commencement date of the Lease was originally July 15, 2017; however, the Lease was extended by Amendment to September 15, 2017, with a base rent of $33,715.00 per month.

5.       Sections 1.14 and 15.1 of the Lease (page 1 and page 17, respectively) address the security deposit in the amount of $67,430.00, which was to be made in two (2) payments. The first payment was required by October 15, 2017, and the second payment by January 15, 2018.

6.       The Debtor avers that, in error, it overpaid the security deposit by $33,715.00, which sum the Landlord still holds, as follows:

| | | |
|---|---|---|
| a) | Invoice #574 for first month's rent: | $33,715.00 |
| b) | Invoice #1425 for security deposit: | $33,715.00 |
| c) | Invoice #1426 for security deposit 50%: | $32,000.00 |
| d) | Invoice #1427 for security deposit: | $1,715.00 |

7.       Invoice #574 indicates that it is for the first month rent (September 2017); however, the Debtor also paid rent for and in September 2017, creating the over-payment.

8.       With regard to the filed Proof of Claim #1, Landlord has attached a "Statement" which reflects the balance due from the Landlord's perspective, on a running total basis, setting forth an invoice number, amount billed, purpose of invoice, and the date of invoice or payment.

9.      The Statement contains six categories of expenses which are listed by date of billing, totaling $44,614.28.  The Debtor states that the following were improperly charged back to the Debtor:

(a)      Landscaping Maintenance with four invoices
(b)      Roof Repair, with four invoices;
(c)      Engineering Report related to water damage;
(d)      Legal Services, with eight invoices;
(e)      Parking Lot Maintenance invoice; and
(f)      Late Rent Fee, that was waived by Landlord.

10.      The Statement attached to the Proof of Claim starts with the first entry, dated 2/14/18, showing a zero-balance brought forward.

11.      The Statement contains four landscaping invoices totaling $8,905.34:

a)      Invoice #1430 dated 2/14/18 for $ 2,539.20
b)      Invoice #1432 dated 2/26/18 for $    100.00
c)      Invoice #1441 dated 5/30/18 for $    634.80
d)      Invoice #1486 dated 6/10/20 for $ 5,631.34

12.      The first two items relate to the Landlord's failure to cancel his landscaper's services when Debtor had taken possession of the premises in May 2017, and engaged a new landscape service.

13.      Items 11(c) & 11(d) relate to the failure of the Landlord to properly restore the landscape, which under Section 7.1 of the Lease on page 10, is the Landlord's responsibility.

14.      The Statement contains four roof repair invoices totaling $8,446.00:

a)      Invoice #1436 dated 04/12/18 for   $ 3,950.00
b)      Invoice #1437 dated 04/12/18 for   $   875.00
c)      Invoice #1483 dated 08/10/18 for   $   479.25
d)      Invoice #1484 dated 11/26/19 for   $ 3,141.75

15.      Pursuant to Section 7.1 of the Lease, the "Landlord warrants that the roof is free from leaks as of the Commencement Date. Landlord shall be responsible for all repairs, maintenance, and replacements to roof."

16.     Section 11.1 requires the Landlord to promptly repair any damage, and the rent shall be abated until the property is repaired.

17.     Upon taking possession of the leased premises, the Debtor discovered that the roof was old and in disrepair. There were twenty-seven (27) leaks.

18.     The Debtor notified the Landlord immediately and the Landlord failed, and continues to fail, to properly repair the roof which began with the initial issues in May 2017 and continue through today, causing the Debtor to incur significant expenses, including loss of use of parts of the Leased Premises, resulting in $178,387.00 in total damages. (See paragraph 25 below for more detail).

19.     Pursuant to Invoice # 1480, dated 10/13/19, the Landlord billed the Debtor the sum of $2,667.50 for the services of an engineer who was engaged by the Landlord to determine the source of a continuing leak in the wall and foundation that flooded a bathroom and kitchen after a heavy rain, rendering them unusable. After the engagement of the engineer, who inspected the roof and premises, the leak stopped.  Under Section 7.1 the Landlord is responsible for this invoice.

20.     At no time has the Landlord complied with Section 11.1 and abated any portion of the rent for the portion of the Leased Premises damaged by the leaking roof.

21.     The Statement contains seven legal services invoices totaling $10,484.63:

| | | |
|---|---|---|
| a) | Invoice #1482 dated 01/20/20 for | $ 1,917.00 |
| b) | Invoice #1479 dated 06/05/20 for | $ 1,011.75 |
| c) | Invoice #1477 dated 06/25/20 for | $   266.25 |
| d) | Invoice #1480 dated 07/01/20 for | $ 1,011.75 |
| e) | Invoice #1481 dated 07/09/20 for | $ 3,461.00 |
| f) | Invoice #1478 dated 07/15/20 for | $   266.25 |
| g) | Invoice #1476 dated 08/19/20 for | $   266.25 |
| h) | Invoice #1485 dated 08/02/20 for | $ 2,284.43 |

22.     Debtor avers that some of the invoices for legal services are related to Landlord's attorneys responding to Debtor's counsel's letters for damages and should not be charged to the

Debtor.

23.     Also, the total legal services invoices need to be reduced by $639.93 for sales taxes erroneously charged.

24.     The Statement contains one parking lot maintenance invoice # 1487, dated 6/12/20 for $13,202.94 and a late fee for March of $1,788.41 at Invoice # 1472 dated 4/1/20 that was waived by the Landlord.

25.     The Landlord is responsible for the parking lot maintenance. Landlord had originally hired a contractor, who improperly and without a permit, resurfaced the lot, and fixed ramps and the sidewalk in front of the building. The City of Weston forced the Landlord to redo the paving. The Debtor has no liability for this expense.

26.     Debtor is also entitled to a setoff of an additional $178,387.00 for damages due to the Landlord's continuing failure to repair the roof.

27.     By letter dated November 2, 2018, counsel for Debtor advised Landlord that the Debtor had suffered $126,090.00 in damages, set forth the damage in detail and made demand for payment (Exhibit "B").

28.     To date, the Landlord has not paid for the damages nor has the Landlord repaired the roof.

29.     On February 6, 2019, Debtor send Landlord an invoice that listed all of the damage caused by the leaking roof (Exhibit "C"). The damages total $172,798.25.

30.     To date, the Landlord has not paid for the damages nor has the Landlord repaired the roof.

31.     On June 11, 2020, the Debtor forwarded an additional invoice (Exhibit "D") for damages totaling $5,589.28, increasing the total of damages from the roof to $178,387.00.

32.    As a result of the Landlord receiving an over-payment of the security deposit from Debtor in the amount of $33,715.00, the improper charging of Debtor for Landlord responsible obligations, and the continuing damages to Debtor because of Landlord's refusal to repair the roof, the allowed claim of the Landlord is properly reduced to $37,167.81. The Debtor's credits, as setoff against the $293,884.09 claim filed by Landlord (POC-1) are summarized as follows:

| | |
|---|---|
| Excess security Deposit | $  33,715.00 |
| Improper Charge(s) | $  44,614.28 |
| Water Damages | $178,387.00 |
| Total Credit | $256,716.28 |

33.    The net allowed claim is calculated as follows:

| | |
|---|---|
| Filed Claim (1-1) | $293,884.09 |
| Credits | $256,716.28 |
| Allowable Claim | $  37,167.81 |

Wherefore the Debtor objects to Proof of Claim #1-1 filed by the Landlord, Weston 3305 Property LLC., and requests that the claim be reduced to $37,167.81.

Dated:  September 16, 2020

**VAN HORN LAW GROUP, P.A.**
330 N Andrews Ave., Suite 450
Fort Lauderdale, FL 33301
Telephone: (954) 765-3166
Facsimile: (954) 756-7103
Email: Chad@cvhlawgroup.com

By: /s/ **Chad Van Horn, Esq.**
Chad Van Horn, Esq.
Florida Bar No. 64500

# Exhibit A

## TRIPLE NET COMMERCIAL LEASE

THIS TRIPLE NET COMMERCIAL LEASE (hereinafter the "Lease") is made on this 25 day of May, 2017 (the "Effective Date"), by and between Weston 3305 Property, LLC, a Florida limited liability company (hereinafter referred to as "LANDLORD") and Gecko Parks, LLC a Florida limited liability company (hereinafter referred to as "TENANT").

In consideration of the rents, covenants and agreements set forth below, the parties hereby agree as follows:

## ARTICLE 1
## INFORMATION PROVISIONS

The following terms shall have meanings assigned hereby:

1.1    LANDLORD. Weston 3305 Property, LLC, a Florida limited liability company.

1.2    Address and Telephone Number of LANDLORD. 7850 PETERS ROAD, F-104; PLANTATION, FL 33324. The LANDLORD's telephone number is 954-214-0254

1.3    TENANT. Gecko Parks, LLC a Florida limited liability company

1.4    Premises. 3305 Corporate Avenue, Weston, FL. 33331

1.5    Address and Telephone Number of TENANT. The TENANT's address for purposes of this lease is: 2467 Provence Cir. The TENANT's telephone number is 415 850 2665 Weston, Fl 33327

1.6    Commencement Date. The Commencement Date shall be July 15, 2017.

1.7    Lease Term. Ten (10) Years, unless sooner terminated as herein provided. This Lease shall be effective after both LANDLORD and TENANT execute it.

1.8    Option Term. Two consecutive options to renew for a period of five (5) years each, at a rental for the renewal term as set forth in Section 3.2, below.

1.9    Permitted Use of the Premises. The Premises shall be used for Creative youth cross fit exercises and various related or similar activities, and for no other use whatsoever without the express written consent of LANDLORD, which consent may be unreasonably withheld in LANDLORD's sole and absolute discretion.

1.10    Base Rent for Initial Term. See paragraph 3.2, below, payable in equal monthly installments per paragraph 3.1, below.

1.11    Operating Costs. Operating costs (triple net expenses) including, without limitation, ad valorem taxes and insurance. Operating costs for the initial lease year will be based on the 2016 figures and shall be provided by LANDLORD to TENANT within 15 days after execution of this Lease.

1.12    Intentionally Deleted

1.13    Intentionally Deleted

1.14    Security Deposit. Sixty-seven Thousand Four Hundred Thirty Dollars ($67,430.00), to be paid in two installments. The first installment of $33,715.00 shall be due on or before October 15, 2017 and the second installment of $33,715.00 shall be due on or before January 15, 2018. The Security Deposit will be held pursuant to Paragraph 15 below.

1

## ARTICLE 2
## PREMISES AND TERM

2.1    <u>Premises</u>.  In consideration of the rents, covenants and agreements to be performed by TENANT, LANDLORD hereby leases to TENANT and TENANT hereby rents from LANDLORD the Premises, subject to easements, restrictions and other matters of record.  LANDLORD reserves the right to place in the Premises utility lines, pipes, HVAC systems, electrical wiring, facilities, additions and improvements LANDLORD deems necessary to provide services to the Premises, and to replace, maintain and repair those items in, over, under and upon the Premises as may have been installed in the building.

2.2    <u>"AS IS" PREMISES</u>.  TENANT COVENANTS AND AGREES TO ACCEPT THE PREMISES IN "AS IS" AND "WHERE IS" CONDITION, WITHOUT ANY AGREEMENTS, REPRESENTATIONS, UNDERSTANDINGS OR OBLIGATIONS ON THE PART OF LANDLORD WHATSOEVER TO PERFORM ANY ALTERATIONS, REPAIRS OR IMPROVEMENTS.

2.3    <u>Lease Year</u>.  The term "<u>Lease Year</u>" as used herein shall mean consecutive twelve (12) month periods commencing on the possession date, and the same day of each successive Lease year during the Lease Term.

2.4    <u>TENANT's Duty to Open for Business</u>.  TENANT shall take possession and open the Premises for business fully fixtured and staffed as of the date TENANT has obtained a Certificate of Occupancy from the City of Weston.

2.5    <u>Surrender of Premises</u>.  At the expiration of the Lease Term, TENANT shall (i) surrender the Premises in the same condition as existed upon the Commencement Date, ordinary wear and tear excepted, and (ii) deliver all keys for and all combinations on locks, safes and vaults in the Premises to LANDLORD.

2.6    <u>Holding Over</u>.  If TENANT holds over or occupies the Premises after expiration of the Lease Term, or the earlier termination of this Lease, without LANDLORD's prior written consent, TENANT shall pay LANDLORD, as liquidated damages, for each day of such holding over a sum equal to the greater of (a) twice the monthly Rent prorated for the number of days of such holding over, or (b) a pro rata portion of all Additional Rent which TENANT would have been required to pay hereunder had this Lease been in effect.  In the event of any unauthorized holding over, TENANT shall also indemnify LANDLORD against all claims for damages by any other TENANT to whom LANDLORD may have leased all or any part of the Premises effective after the termination of this Lease.  No payments of money by TENANT after expiration of the Lease Term or the earlier termination of this Lease will reinstate, continue or extend the Lease Term; reduce the liability of TENANT to LANDLORD for damages; or affect any termination notice given by LANDLORD to TENANT.  No extension of the Lease Term will be valid unless and until the same will be reduced to writing and signed by both LANDLORD and TENANT.

2.7    <u>Possession</u>.  In the event TENANT is granted possession of the Premises prior to the Commencement Date, TENANT hereby agrees and acknowledges that is shall comply with each and every covenant of this Lease during any such timeframe.

## ARTICLE 3
## RENT

3.1    <u>Rent</u>.  During the Lease Term, TENANT covenants to pay to LANDLORD's management company, DUVAL GROUP, INC., at the office of LANDLORD as set forth in Paragraph 1.2 hereof, or at such other place as LANDLORD may designate in writing, all of the Rent provided for herein.  Rent shall be due on or before the fifteenth (15th) of each month in advance, without demand, notice, deduction or setoff of any kind.  TENANT shall pay Rent for the first full month of this Lease payable on the Effective Date.  Should the Lease Term and TENANT's obligation to pay Rent commence on a day other than the first of the month, TENANT shall pay Rent for the fractional month preceding the first day of the first full

2



month of this Lease, on a per diem basis (calculated on the basis of a thirty (30) day month) payable on the Commencement Date. All subsequent payments of rent shall be due and payable on the first (1ˢᵗ) day of each succeeding month. Any payment of Rent hereunder for any other fractional month shall likewise be calculated and paid on such per diem basis.

3.2    Rent Amount and Schedule.    The Parties acknowledge that the Operating Expenses under section 1.10 are due and payable as additional rent monthly with the base rental amount and any escalations as specified below.

FIRST LEASE YEAR (July 15, 2017 through July 14, 2018): Monthly rent shall be THIRTY THREE THOUSAND SEVEN HUNDRED FIFTEEN DOLLARS ($33,715.00.00) (hereinafter "First Year Base Rent"), plus tax and operating expenses as specified herein.

SECOND LEASE YEAR (July 15, 2018 through July 14, 2019): Monthly rent shall be the monthly "First Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Second Year Base Rent"), plus tax and operating expenses as specified herein.

THIRD LEASE YEAR (July 15, 2019 through July 14, 2020): Monthly rent shall be the monthly "Second Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Third Year Base Rent"), plus tax and operating expenses as specified herein.

FOURTH LEASE YEAR (July 15, 2020 through July 14, 2021): Monthly rent shall be the monthly "Third Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Fourth Year Base Rent"), plus tax and operating expenses as specified herein.

FIFTH LEASE YEAR (July 15, 2021 through July 14, 2022): Monthly rent shall be the monthly "Fourth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Fifth Year Base Rent"), plus tax and operating expenses as specified herein.

SIXTH LEASE YEAR (July 15, 2022 through July 14, 2023): Monthly rent shall be the monthly "Fifth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Sixth Year Base Rent"), plus tax and operating expenses as specified herein.

SEVENTH LEASE YEAR (July 15, 2023 through July 14, 2024): Monthly rent shall be the monthly "Sixth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Seventh Year Base Rent"), plus tax and operating expenses as specified herein.

EIGHTH LEASE YEAR (July 15, 2024 through July 14, 2025): Monthly rent shall be the monthly "Seventh Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Eighth Year Base Rent"), plus tax and operating expenses as specified herein.

NINTH LEASE YEAR (July 15, 2025 through July 14, 2026): Monthly rent shall be the monthly "Eighth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Ninth Year Base Rent"), plus tax and operating expenses as specified herein.

TENTH LEASE YEAR (July 15, 2026 through July 14, 2027): Monthly rent shall be the monthly "Ninth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Tenth Year Base Rent"), plus tax and operating expenses as specified herein.

In the event that the TENANT exercises its first option to renew the Lease, then the rent for the option period shall be:

ELEVENTH LEASE YEAR (July 15, 2027 through July 14, 2028): Monthly rent shall be the monthly "Tenth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Eleventh Year Base Rent"), plus tax and operating expenses as specified herein.

3



**TWELFTH LEASE YEAR (July 15, 2028 through July 14, 2029):** Monthly rent shall be the monthly "Eleventh Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Twelfth Year Base Rent"), plus tax and operating expenses as specified herein.

**THIRTEENTH LEASE YEAR (July 15, 2029 through July 14, 2030):** Monthly rent shall be the monthly "Twelfth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Thirteenth Year Base Rent"), plus tax and operating expenses as specified herein.

**FOURTEENTH LEASE YEAR (July 15, 2030 through July 14, 2031):** Monthly rent shall be the monthly "Thirteenth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Fourteenth Year Base Rent"), plus tax and operating expenses as specified herein.

**FIFTEENTH LEASE YEAR (July 15, 2031 through July 14, 2032):** Monthly rent shall be the monthly "Fourteenth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Fifteenth Year Base Rent"), plus tax and operating expenses as specified herein.

In the event that the TENANT exercises its second option to renew the Lease, then the rent for the option period shall be:

**SIXTEENTH LEASE YEAR (July 15, 2032 through July 14, 2033):** Monthly rent shall be the monthly "Fifteenth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Sixteenth Year Base Rent"), plus tax and operating expenses as specified herein.

**SEVENTEENTH LEASE YEAR (July 15, 2033 through July 14, 2034):** Monthly rent shall be the monthly "Sixteenth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Seventeenth Year Base Rent"), plus tax and operating expenses as specified herein.

**EIGHTEENTH LEASE YEAR (July 15, 2034 through July 14, 2035):** Monthly rent shall be the monthly "Seventeenth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Eighteenth Year Base Rent"), plus tax and operating expenses as specified herein.

**NINETEENTH LEASE YEAR (July 15, 2035 through July 14, 2036):** Monthly rent shall be the monthly "Eighteenth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Nineteenth Year Base Rent"), plus tax and operating expenses as specified herein.

**TWENTIETH LEASE YEAR (July 15, 2036 through July 14, 2037):** Monthly rent shall be the monthly "Nineteenth Year Base Rent" multiplied by one hundred three per cent (103%) (hereinafter "Twentieth Year Base Rent"), plus tax and operating expenses as specified herein.

3.3    <u>Additional Rent</u>.  Any and all other sums of money or charges required to be paid by TENANT pursuant to the provisions of this Lease, whether or not the same be so designated, shall be considered as "<u>Additional Rent</u>", and shall be payable and recoverable in the same manner as Rent.

3.4    <u>Past Due Rent and Additional Rent</u>.  If TENANT shall fail to pay when due any Rent or other charges designated as Additional Rent, TENANT shall pay to LANDLORD, on demand, a late charge of five percent (5%) of the late amount and attorneys' fees and costs. In the event TENANT fails to pay such late charge and attorneys' fees and costs, such unpaid amounts shall thereafter bear interest from the due date thereof to the date of payment at the highest rate chargeable by applicable law ("<u>Applicable Rate</u>").

3.5    <u>Expenditures by LANDLORD</u>.  If LANDLORD shall make any expenditure for which TENANT is liable under this Lease, the amount thereof shall be deemed Additional Rent due and payable by TENANT with the succeeding installment of Rent (unless some other date is expressly provided herein for payment of such amount) together with interest thereon at eighteen percent (18%).

4



3.6   _Sales, Use and Excise Taxes._  TENANT shall pay all sales, use and other taxes imposed by any governmental authorities upon the manufacture, sale, use, transmission, distribution or other process necessary or incidental to the furnishing of sewer, water, electricity, and domestic water or other services to the Premises.   TENANT shall pay, before delinquency, all personal property taxes and assessments on the furniture, fixtures, equipment, and other property of TENANT located in the Premises and on additions and improvements in the Premises belonging to TENANT.  TENANT shall also pay, as Additional Rent, all sales tax assessed against the Rent by governmental authority, even though taxing statute or ordinance may purport to impose such sales tax against LANDLORD.  TENANT shall pay sales tax on a monthly basis, concurrently with payment of the Rent.

3.7   _Utility Services._  TENANT shall be solely responsible for and promptly and timely pay all charges for use or consumption of all utility services used or consumed within the Premises.  If any such charges are not paid when due, LANDLORD may, at its option, pay the same, and any amount so paid by LANDLORD shall thereupon become due to LANDLORD from TENANT as Additional Rent.  If there are separate meters for gas and electricity, TENANT will be the responsible party on the utility bill. LANDLORD reserves the right to install flow meters on the water lines and charge TENANT accordingly for its use of water.  In no event shall LANDLORD be liable for an interruption or failure in the supply of any such utilities to the Premises.  TENANT shall also be required, prior to the Commencement Date, to pay to LANDLORD any and all water connection charges, including impact fees, any metering charges and all other utility fees and utility allocation expenses for the Premises if LANDLORD has been required by the governing municipality to pay these charges.

3.8   _Net Lease._  _It is the intent of the parties hereto that Rent payable under this Lease at all times, shall be absolutely net to LANDLORD._  Any amount and any obligation, which is not expressly declared herein to be that of LANDLORD pertaining to the Premises, shall be deemed to be the obligation of TENANT to be performed by and at the expense of TENANT.

3.9   _Intentionally Deleted._

3.10   _Initial Payment of Rent and Security Deposit._  Notwithstanding anything elsewhere in this Lease to the contrary, TENANT shall pay the rent payment for March 15, 2018 to LANDLORD upon execution of this Lease.  Subsequent payments of rent shall commence on April 15, 2018, as set forth above.

3.11   _Rent Credit._  Anything to the contrary in the foregoing notwithstanding, LANDLORD waives the Base Rent hereunder for the first eight (8) months of the Lease. The prepaid Base Rent set forth in Paragraph 3.11 shall be applied to the ninth (9th) month's rent.  In addition, pursuant to Section 5.1 hereof, Operating Costs shall be waived for the first four (4) months of the Lease Term and TENANT shall begin paying Operating Costs on the fifth month of the Lease Term.

## ARTICLE 4
## USE OF PREMISES

4.1   _Use._  TENANT shall use the Premises solely for the purpose of conducting business in accordance with Paragraph 1.9 hereof.  TENANT shall not use, permit or suffer the use of the Premises for any other business or purpose.  TENANT shall not sell, display or advertise any merchandise not specifically permitted by this paragraph.  In the event TENANT desires to use the demised premises for any other use not specifically permitted herein, TENANT must first obtain LANDLORD's written approval. LANDLORD may arbitrarily and in its sole discretion, withhold consent to the same.



4.2    Continued Use. TENANT covenants to operate the business described above during the entire Lease Term, continuously, in one hundred percent (100%) of the demised Premises during each hour of the Lease Term when TENANT is required under this Lease to be open for business, with due diligence and efficiency. Failure of TENANT to strictly adhere to the provisions of this paragraph will result in damages to LANDLORD, including, but not limited to, diminished salability, mortgage ability and economic value.

4.3    Compliance With Laws and Regulations. TENANT shall, at TENANT's sole cost and expense, comply with all laws, statutes, ordinances, rules and regulations (including orders concerning environmental protection) of all federal, state, county, municipal, and other applicable governmental authorities, including, but not limited to, the City of Weston, now in force, or which may hereafter be in force, pertaining to TENANT or its use of the Premises (collectively the "Regulations"). TENANT shall be responsible for resolving any and all code violations with the City of Weston and paying any and all fees and charges incident thereto.

4.4    Rules and Regulations.

(a) TENANT covenants to comply with the following:

(1)    No auction, fire, bankruptcy, going-out-of-business, relocation, or other distress sales may be conducted in the Premises.

(2)    TENANT will keep all mechanical apparatus free of vibration and noise that may be transmitted beyond the confines of the Premises. TENANT will not permit or suffer any conduct, noise or nuisance on or about the Premises that may annoy or disturb any persons occupying adjacent premises. No radio, television or other communication antenna equipment or device is to be mounted, attached or secured to any part of the roof, exterior surface or anywhere outside the Premises.

(3)    This covenant shall restrict TENANT from utilization of any advertising medium which can be heard or experienced outside of the Premises, including, without limiting the generality of the foregoing, flashing lights, search lights, loudspeakers, phonographs, radios or televisions (hereinafter referred to as a "Special Event"), unless said Special Event is properly permitted by the City of Weston and evidence of same is furnished to LANDLORD, along with notice of the proposed Special Event, prior to the date thereof. In addition TENANT shall obtain additional insurance coverage for any such Special Event as may be required by the City of Weston and/or LANDLORD. Evidence of such insurance shall be provided to LANDLORD at least 48 hours prior to the Special Event and shall list LANDLORD as an additional insured.

(4)    TENANT will keep the Premises and the outside areas adjoining the Premises, free from all insects, rodents, vermin and other pests, litter, dirt and obstruction and not display or sell merchandise on sidewalks.

(5)    All store floor area of TENANT, including vestibules, outside docks, entrances and exits; doors, fixtures, storefront windows, storefront window areas and plate glass shall be maintained in a safe, neat and clean condition.

(6)    TENANT will not permit or suffer the Premises, or the walls or floors thereof, to be endangered by overloading.

(7)    Tractor-trailers are to be removed from the loading areas immediately after unloading. In the event TENANT shall desire to maintain a permanent trailer in any of the loading areas, TENANT may do so, provided that they obtain all appropriate permits therefor from the City of Weston and provide copies of same to LANDLORD prior to the trailer being brought on to the Premises. TENANT shall renew the permit and provide LANDLORD with copies of each such renewal for the entire period that the trailer remains on the Premises.

6



(8)    All garbage and refuse shall be kept in the kind of containers as required by the City of Weston and as designated by LANDLORD and shall be placed outside the Premises within said containers prepared for collection in such manner and at such times and places specified by LANDLORD.

(9)    All deliveries of goods and fixtures for use in the Premises shall be done only at such times, in the areas, and through the entrances designated for such purpose by LANDLORD. Such designation shall not unreasonably interfere with the conduct of any other tenants' business.

(b)    LANDLORD reserves the right from time to time to suspend, amend or supplement the foregoing rules and regulations, and to adopt and promulgate additional reasonable rules and regulations applicable to the Premises. Notice of such rules and regulations and amendments and supplements thereto, if any, shall be given to TENANT.

(c)    TENANT agrees to comply with all additional, amended and supplemental rules and regulations upon notice of same from LANDLORD.

## ARTICLE 5
## OPERATING EXPENSES

5.1    <u>Components of Operating Expenses</u>.    In addition to Rent and other amounts due hereunder, beginning with the Fifth Month of the Lease Term, TENANT shall pay as Additional Rent all expenses, costs and disbursements of every kind and nature that LANDLORD shall pay or be obligated to pay because of or in connection with the ownership, operation and maintenance of the Premises including, but not limited to, the following costs and expenses (the "Operating Costs"):

(a)    <u>Taxes and Assessments</u>.  Any real estate taxes, assessments of any kind, sewer rents, rates and charges, parking taxes, and other federal, state or local government charges, general, ordinary or extraordinary, which may now or hereafter be levied or assessed against the Premises (collectively the "<u>Taxes</u>").  If at any time during the Lease Term the method of taxation then prevailing is altered to impose taxes directly upon LANDLORD in place or partly in place of the Taxes, then all such new taxes imposed directly upon LANDLORD shall be included within Operating Costs.

(b)    <u>Insurance</u>.  All premiums for public liability, fire and extended coverage or all risk, business interruption, and/or any other insurance coverage which may reasonably be carried by LANDLORD with respect to the Premises.

(c)    <u>Repairs and Maintenance</u>.  Any and all costs associated with maintaining the entire building of which the Premises are a part, in first-class condition, including without limitation: structural and non-structural repairs, painting, renovations and all other costs associated with such building maintenance.

(d)    <u>Capital Investment Items</u>.  Contribution for amortization of the cost of all capital investment items which are primarily for the purposes of increasing the operating efficiency of any portion of the Premises, reducing Operating Costs or attempting to satisfy what may be required by any governmental authority.

LANDLORD acknowledges that Operating Expenses are not payable for the first four (4) months of the Lease.

5.2    <u>Method of Payment</u>.  The Operating Costs (triple net expenses) payable by TENANT during the initial term of this Lease and the Option Term shall be paid monthly, in advance, along with Rent and all other monies due hereunder in an amount estimated by LANDLORD.  Upon receipt of all bills attributed to any calendar year during the Lease Term, LANDLORD shall furnish TENANT with a written statement of the Operating Costs for such year.  If the total amount paid by TENANT under this Article for any calendar year during the Lease Term shall be less than the actual amount due from

7

TENANT for such year, TENANT shall pay to LANDLORD the deficiency within ten (10) days after demand by LANDLORD, and such amount shall be deemed "Additional Rent"; and if the total amount paid by TENANT for any such calendar year shall exceed such amount due from TENANT for such calendar year, TENANT shall be entitled to a credit of the excess against subsequent payments due under this Article. For the calendar years in which this Lease commences and terminates, the provisions of this Article shall apply and TENANT's liability for Operating Costs for any such year shall be subject to a prorated adjustment based on the number of days of any such year that the Lease Term is in effect. Prior to or on the Commencement Date, and from time to time thereafter throughout the Lease Term, LANDLORD shall notify TENANT in writing of LANDLORD's estimate of TENANT's monthly installments due hereunder.

## ARTICLE 6
## INSURANCE

6.1     Insurance Coverage by LANDLORD.  LANDLORD shall maintain during the Lease Term (and the cost thereof shall be included in the Operating Costs), insurance for fire, extended coverage, flood, windstorm, vandalism and malicious mischief, insuring the improvements located on the Premises and all appurtenances thereto (excluding wall covering, floor covering and drapes). LANDLORD may also maintain (i) rent or rent value insurance including an extended coverage endorsement with respect to the Premises in an amount equal to the annual Rent for the Premises; and (ii) such other insurance as LANDLORD deems reasonably necessary or desirable to protect the Premises against loss.

Payments for losses under any such insurance policies shall be made solely to LANDLORD. Notwithstanding the foregoing, if any loss sustained by LANDLORD is caused by the negligence of TENANT, its agents, servants, employees, licenses, invitees or guests, then TENANT shall be liable to LANDLORD for the amount of the deductible under LANDLORD's insurance. Further, LANDLORD shall not be responsible for loss or damage to items for which TENANT is responsible, as is more fully set forth below.

6.2     Insurance Coverage by TENANT.  TENANT agrees to carry and keep in full force and effect, during the Lease Term:

(A)     bodily injury, public liability insurance on and adjacent to the Premises against the liability of TENANT and its authorized representatives arising out of or in connection with TENANT's use or occupancy of the Premises, with limits of coverage of not less than ONE MILLION DOLLARS ($1,000,000.00) per accident and injury or death;

(B)     an umbrella liability policy in the amount of Two MILLION DOLLARS ($2,000,000.00) per accident and injury or death;

(C)     property damage insurance covering the Premises, including the buildout, in an amount not less than the full replacement cost, as determined by LANDLORD's insurance agent from time to time (without provision for coinsurance);

(D)     personal property damage insurance covering the TENANT's merchandise, trade fixtures, furnishings, wall coverings, carpeting, drapes, equipment and all other items of personal property of TENANT located on or within the Premises

(E)     workers compensation insurance in the minimum amount permitted under Florida law;

(F)     insurance against fire, flood and such other risks as are, from time to time, included in standard extended coverage insurance, including insurance against sprinkler damage, vandalism and malicious mischief;

In consideration for reducing the umbrella insurance to the amounts reflected herein, TENANT and LANDLORD hereby agree that LANDLORD will carry an additional umbrella liability policy in the amount of Two MILLION DOLLARS ($2,000,000.00) per accident and injury or death incident to the Premises and that the cost of same, up to the maximum amount of $3,000.00, will be included in the Operating Cost of the Premises pursuant to Article 5 of this Lease. Any cost for this policy in excess of $3,000.00 shall be paid by LANDLORD.



Any proceeds from the personal property insurance shall, for so long as this Lease remains in effect, be used to repair or replace or repair the insured property. The replacement of any plate glass damaged or broken from any cause whatsoever in and about the Premises shall be TENANT's responsibility.

All policies shall name LANDLORD, LANDLORD's lender, and any person, firms, or corporations designated by LANDLORD, as additional insured (s), and shall contain a clause that the insurer will not cancel or change the insurance without first giving LANDLORD thirty (30) days prior written notice.

The insurance carrier providing the insurance as required hereunder shall be licensed in the State of Florida, shall carry a Best's Rating of A-VIII or higher, shall be non-contributing with, and shall apply only as primary and not as excess to any other insurance available and shall be satisfactory to LANDLORD, in LANDLORD's sole discretion, and LANDLORD's lender.    TENANT shall provide LANDLORD with copies of the policies or certificates evidencing that such insurance are in full force and effect and stating the terms thereof. The limits of such insurance shall not, under any circumstances, limit the liability of TENANT hereunder.

Evidence of such insurance shall be delivered to LANDLORD no later than ten (10) days prior to TENANT taking occupancy of the Premises, and no later than ten (10) days prior to the anniversary date of each policy at all times during the term of this Lease.  In the event TENANT fails to procure, maintain and/or pay for the insurance required by this Lease, at the times and for the durations specified in this Lease, LANDLORD shall have the right, but not the obligation, at any time and from time to time, and without notice to TENANT, to procure such insurance and/or pay for the premiums for such insurance, in which event TENANT shall repay LANDLORD immediately upon demand by LANDLORD as Additional Rent hereunder, all sums so paid by LANDLORD together with the interest at Eighteen Percent (18%), together with any costs or expenses incurred by LANDLORD in connection therewith, without prejudice to any other rights and remedies of the LANDLORD under this Lease.

Each policy evidencing the insurance to be carried by TENANT pursuant to this Lease shall contain a clause that such policy and the coverage evidenced thereby shall be primary with respect to any policies by LANDLORD and that any coverage carried by LANDLORD shall be excess insurance.

6.3    Waiver of Subrogation.  LANDLORD and TENANT waive, unless said waiver should invalidate any such insurance, their right to recover damages against each other for any reason whatsoever to the extent the damaged property owner recovers indemnity from its insurance carrier.  All public liability and property damage policies shall contain an endorsement that LANDLORD, although named as an additional insured, shall nevertheless be entitled to recover the damages caused by the negligence of TENANT.

6.4    TENANT's Contractor's Insurance.  TENANT shall require any contractor of TENANT performing work on the Premises to carry and maintain, at no expense to LANDLORD:

(a)    Comprehensive general liability insurance, including contractor's liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage to afford protection, with limits for each occurrence of not less than One Million Dollars ($1,000,000.00) with respect to personal injury or death, and One Million Dollars ($1,000,000.00) with respect to personal injury or death, and One Million Dollars ($1,000,000.00) with respect to property damage; and

(b)    Workers' compensation or similar insurance in form and amounts required by Florida and/or Federal law.

9



6.5 __Increase in Fire Insurance Premium__. TENANT agrees it will not keep, use, sell or offer for sale in or upon the Premises any article that may be prohibited by the standard form of fire and extended risk insurance policy. TENANT agrees to pay any increase in premiums for fire and extended coverage insurance that may be charged during the Lease Term on the amount of such insurance which may be carried by LANDLORD on the Premises or the building of which they are a part, resulting from the type of merchandise sold by TENANT in the Premises or resulting from TENANT's use of the Premises, whether or not LANDLORD has consented to the same. In determining whether increased premiums are the result of TENANT's use of the Premises, a schedule issued by the organization making the insurance rate on the Premises, showing the various components of such rate, shall be conclusive evidence of the several items and charges which make up the fire insurance rate on the Premises. TENANT agrees to promptly make, at TENANT's sole cost, any repairs, alterations, changes and/or improvements to equipment in the Premises required by the company issuing LANDLORD's fire insurance so as to avoid the cancellation of or the increase in premiums on said insurance.

### ARTICLE 7
### MAINTENANCE, REPAIR AND ALTERATIONS

7.1 __Maintenance Obligations__.

(a) TENANT agrees that from and after the Commencement Date and until the expiration of the Lease Term, TENANT will be responsible for all repairs, maintenance and replacements to the Premises, including but not limited to, the interior and exterior portions of all doors, windows, plate glass and showcases surrounding the Premises; the mechanical, plumbing, heating and electrical equipment and systems servicing the Premises, whether located in, on or adjacent to the Premises; partitions and all other fixtures, appliances, grease traps and facilities furnished by TENANT or LANDLORD. LANDLORD shall be responsible for maintaining and repairing the exterior foundations and structural portions of the Premises, unless the damage has been caused by TENANT, its officers, partners, agents, servants, employees, customers, contractors, invitees, concessionaires or licensees. After taking possession of the Premises TENANT shall be responsible for maintenance of HVAC; however, prior to taking possession TENANT may at TENANT's option have the HAVC inspected and, if any repairs to the HVAC are needed at that time, LANDLORD shall make such repairs at LANDLORD's expense. TENANT shall be responsible for subsequent maintenance of the HVAC. LANDLORD warrants that the roof is free from leaks as of the Commencement Date. LANDLORD shall be responsible for all repairs, maintenance, and replacements to the roof. TENANT shall not, however, be responsible for repair of any damage caused by any act or negligence of LANDLORD, its employees or agents. TENANT shall be required to make structural repairs or alterations to the Premises that may be required any Regulations. LANDLORD, without notice, may, but shall not be obligated to, perform TENANT's obligations and add the cost of such work to the next installment of Rent due hereunder. LANDLORD agrees to paint the exterior of the Premises before or within three (3) months after the Commencement Date. LANDLORD shall also restore the existing landscaping to a presentable appearance, but is under no obligation to install any new landscaping. After the Commencement Date, TENANT shall be solely responsible for maintenance, repair, and, if necessary, replacement of all landscaping, including compliance with all City of Weston landscaping requirements.

The parties acknowledge that the HVAC currently servicing the Premises is for the office space portion of the Premises only, and that the warehouse portion of the Premises is not serviced by HVAC. LANDLORD is under no obligation to provide HVAC for the warehouse portion of the Premises. TENANT may, at its option, install HVAC for the warehouse portion of the Premises at TENANT'S sole expense. TENANT acknowledges that, after the Commencement Date, TENANT shall be solely responsible for maintenance, repair, and, if necessary, replacement of all HVAC servicing the Premises.

10



(b)    TENANT will not install any equipment that exceeds the capacity of the utility lines leading into the Premises or the building of which the Premises constitute a portion.

(c)    TENANT, its employees, or agents, shall not mark, paint, drill or in any way deface any walls, ceilings, partitions, floors, wood, stone or ironwork without LANDLORD's written consent.

(d)    TENANT shall give LANDLORD prompt written notice of any accident, fire or damage occurring on or to the Premises or to any defects therein or in any fixtures or equipment.

(e)    Neither LANDLORD nor LANDLORD's agents or servants shall be liable for any damages caused by or growing out of any breakage, leakage, or defective condition of the electric wiring, air conditioning or heating pipes and equipment, closets, plumbing, appliances, sprinklers, other equipment, or other facilities, serving the Premises. Neither LANDLORD nor LANDLORD's agents or servants shall be liable for any damages caused by, or growing out of any defect in the Premises or any part thereof for fire, rain, wind or other cause.

(f)    All property belonging to TENANT shall be there at the risk of TENANT or such other person only, and LANDLORD shall not be liable for damage thereto or theft or misappropriation thereof.

7.2    <u>Alterations by TENANT</u>.    TENANT will not make any alterations, renovations, improvements or other installations in or to any part of the Premises (including, without limitation, any alterations of the storefront, signs, structural alterations, or any cutting or drilling into any part of the Premises or any securing of any fixture, apparatus or equipment of any kind to any part of the Premises), unless and until TENANT shall have caused plans and specifications therefore to have been prepared, at TENANT's expense, by an architect or other duly qualified person and shall have obtained LANDLORD's written approval thereof. If such approval is granted, TENANT shall cause the work described in such plans and specifications to be performed, at its expense, promptly, efficiently, competently and in a good and workmanlike manner by duly qualified or licensed persons or entities. All such work shall comply with all applicable local and State building, health and safety codes, including permitting requirements of the City of Weston. Additionally, TENANT shall comply with the following, in the event that the TENANT desires to make any modifications, additions or alterations to the Premises, (in addition to any other provision of this Lease):

Prior to TENANT's commencing any work upon the Premises, it must first obtain the LANDLORD's written approval of the plans and specifications and otherwise comply with the following and/or produce the following documents for LANDLORD's prior approval:

1.    A full set of "Permit Ready" plans
2.    A copy of the building permit issued by the appropriate governmental body having jurisdiction thereof;
3.    A copy of the TENANT'S Contractor's license evidencing the fact that it is licensed to do business and to act as a General Contractor in this geographical area.
4.    A Hold Harmless and Indemnification Agreement in favor of the LANDLORD executed by the TENANT and its General Contractor;
5.    A certificate of insurance in a form and in amounts acceptable to LANDLORD reflecting liability insurance in favor of the LANDLORD issued by the Insurer of the Contractor together with a workman's compensation policy (<u>see</u>, above, regarding insurance minimums;
6.    A certificate of insurance in a form and in amounts acceptable to LANDLORD reflecting liability insurance in favor of the LANDLORD issued by the Insurer of the TENANT.
7.    A copy of the Construction Contract between the TENANT and its General Contractor.

The LANDLORD during the various phases of construction by TENANT shall be entitled through LANDLORD'S agent to examine the work as it progresses. Accordingly, the TENANT will cure any defective work brought to its attention by the LANDLORD.

11



## ARTICLE 8
## FIXTURES, PERSONAL PROPERTY AND SIGNS

8.1    Intentionally Deleted.

8.2    Signs.  TENANT shall promptly erect a sign within the area designated by LANDLORD, which sign shall be subject to the prior written approval of all applicable local government, as required. TENANT will not place, without LANDLORD's prior written approval, or permit to be placed or maintained on any exterior door, wall or window of the Premises any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place or maintain any decoration, letter or advertising matter on the glass of any window or door.  Any such signs, awning, canopy, decoration, lettering, advertising matter or other thing as may be approved by LANDLORD, shall be maintained in good condition and repair at all times and shall conform to the criteria established from time to time by LANDLORD.

## ARTICLE 9
## ASSIGNING, MORTGAGING, SUBLETTING, CHANGE IN OWNERSHIP

9.1    Consent Required.  TENANT shall not sell, transfer, assign, sublet, enter into any license, management or concession agreements, change ownership, pledge, mortgage or hypothecate this Lease or TENANT'S interest in and to the Premises (hereafter referred to as a "Disposition") without the prior written consent of LANDLORD which may be arbitrarily and unreasonably withheld, in LANDLORD's sole and absolute discretion.  For purposes of this section, it shall not be deemed unreasonable for the LANDLORD withhold consent if the proposed assignee, subtenant, licensee or other proposed tenant shall not be of equal or greater financial ability as the current TENANT and LANDLORD may require the current TENANT to remain as a guarantor for such proposed assignee, subtenant, licensee or other proposed tenant.  Any Disposition without LANDLORD's prior express written consent shall be void and confer no rights upon any third person.  Without in any way limiting LANDLORD'S right to refuse to give such consent for any other reason or reasons in its sole and absolute discretion, LANDLORD reserves the right to refuse to give such consent if TENANT is in default hereunder or if in LANDLORD'S business judgment the quality of merchandising operation on the Premises is or may be in any way adversely affected during the Lease Term or the financial worth of the proposed new TENANT is less than that of TENANT or of TENANT'S guarantor, as the case may be. Nothing in this paragraph shall relieve or release TENANT and any guarantor from its covenants and obligations for the Lease Term. TENANT agrees to reimburse LANDLORD for LANDLORD's reasonable attorneys' fees incurred in conjunction with the processing and documentation of any requested Disposition, which shall be a minimum of $750.00.  No interest in this Lease shall pass to any trustee or receiver in bankruptcy, to any estate of TENANT, to any assignee of TENANT for the benefit of creditors or to any other party by operation of law or otherwise without LANDLORD's written consent.  If this Lease is assigned, or if the Premises or any part thereof is underlet or occupied by any party other than TENANT, LANDLORD may collect rent from the assignee, TENANT or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting, occupancy, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, TENANT or occupant as TENANT, or a release of TENANT from the further performance by TENANT of the covenants on the part of TENANT herein contained.  This prohibition against a Disposition shall be construed to include a prohibition against any assignment or subleasing by operation of law, legal process, receivership, bankruptcy or otherwise, whether voluntary or involuntary and a prohibition against any encumbrance of all and any part of TENANT's leasehold interest in the Premises.

9.2    Change in Ownership.  Because the TENANT is an LLC, the transfer, assignment or hypothecation of any ownership interest in the LLC in excess of twenty-five percent (25%) of the membership interests shall be deemed a Disposition for purposes of this Lease.  TENANT shall give LANDLORD written notice of any such proposed Disposition, together with full financial statements for the party proposing to purchase such ownership interest.  The proposed purchaser of such ownership interest must demonstrate a greater financial status than the party whose interest is being purchased or replaced. LANDLORD shall have thirty (30) days from receipt of said written notice and financial statements within which to approve or deny the transfer.



9.3    <u>Right of First Refusal</u>. TENANT shall have a Right of First Refusal to purchase the Premises during the term of this Lease. In the event LANDLORD determines to accept an offer to sell the Premises to a third party during the term of this Lease, LANDLORD shall give TENANT notice of the price and terms of such offer. TENANT shall have seven (7) days from the date of such notice within which to notify the LANDLORD in writing of TENANT's exercise of its Right of First Refusal and to execute a replacement offer on the same terms. In the event TENANT waives the exercise of its Right of First Refusal or fails to timely provide LANDLORD with notice of its exercise of same, LANDLORD shall be free to sell the Premises to the third party. In the event TENANT chooses not to exercise its Right of First Refusal, TENANT shall deliver a written waiver of same to LANDLORD in form and substance acceptable to the title agent handling the transaction within 5 days of request thereof. Notwithstanding any of the aforementioned, this provision shall not apply to the sale of the Premises by any lender that obtains title by foreclosure of a mortgage encumbering the Premises or by deed in lieu of such foreclosure.

## ARTICLE 10
## QUIET ENJOYMENT

10.1    <u>LANDLORD's Covenant</u>. Provided TENANT timely pays Rent, Additional Rent and all other amounts required by this Lease, and observes and performs all the covenants, terms and conditions of this Lease, TENANT shall peaceably and quietly hold and enjoy the Premises for the Lease Term without interruption by LANDLORD or any person or persons claiming by, through or under LANDLORD, subject to the terms and conditions of this Lease, all applicable restrictions applying to the Premises, and the requirements of the City of Weston.

## ARTICLE 11
## DAMAGE AND DESTRUCTION

11.1    <u>Damage to Premises</u>. If the Premises are damaged or destroyed or rendered partially untenantable for their accustomed use, without fault of TENANT, by fire or other casualty insured under the coverage obtained by LANDLORD, LANDLORD shall promptly repair the same to substantially the condition they were in immediately prior to the happening of such casualty (excluding TENANT's stock in trade, fixtures, furniture, furnishings, carpeting, wall covering, floor covering and drapes); to the extent, however, that insurance proceeds are available. If insurance proceeds are unavailable or insufficient for any reason, LANDLORD may terminate this Lease by written notice to TENANT within thirty (30) days after it determines, in its sole and absolute discretion, that such insurance proceeds are unavailable for repairs and restoration. From the date of such casualty until the Premises are so repaired and restored, Rent shall abate in such proportion as the part of the Premises destroyed or rendered untenantable bears to the total Premises.

## ARTICLE 12
## EMINENT DOMAIN

12.1    <u>Condemnation</u>. In the event all or any material part, as reasonably determined by the LANDLORD, of the Premises shall be taken or condemned for any public or quasi-public use or purpose, or, if by reason of any appropriation or taking, regardless of the amount so taken, the remainder of the Premises is not usable for the purposes for which the Premises were leased, as reasonably determined by the LANDLORD, then either LANDLORD or TENANT shall have the right to terminate this Lease as of the date TENANT is required to vacate the portion of the Premises so taken. Notice of such termination shall be given to the other party in writing within sixty (60) days after notice of such taking. In the event of such termination, both LANDLORD and TENANT shall thereupon be released from any further liability to each other.

13



TENANT shall not be entitled to receive any portion of any award made or paid to LANDLORD representing the Premises or any interest of LANDLORD taken or damaged and TENANT hereby expressly waives and relinquishes any right or claim to any portion of any such award regardless of whether any such award includes any value attributable to TENANT's leasehold estate. However, TENANT shall have the right to claim and recover from the condemning authority, but not from LANDLORD, such special and separate damages as may be recoverable by TENANT for trade fixtures and other equipment (not including any TENANT's Work required or permitted under this Lease), independent of and without diminution of LANDLORD's recovery.

Except as set forth above, any non-material partial taking shall be treated in the same manner as a casualty loss for which neither party elects to terminate this Lease, as provided herein.

12.2    <u>Damages</u>. Whether or not this Lease is terminated, LANDLORD shall be entitled to the entire award or compensation ("Award") in any condemnation proceedings, but nothing herein shall be deemed to affect TENANT's right to pursue from the condemning authority, but not from LANDLORD, compensation or damages for its fixtures and personal property. If this Lease is terminated as provided above, all items of Rent, Additional Rent and other charges for the last month of TENANT's occupancy shall be prorated, and LANDLORD agrees to refund to TENANT any Rent, Additional Rent or other charges paid in advance.

12.3    <u>Restoration</u>. If this Lease is not terminated, TENANT shall remain in that portion of the Premises which shall not have been appropriated or taken, and LANDLORD agrees, to the extent of the proceeds of the Award, as soon as reasonably possible, to restore the remaining portion of the Premises to a similar quality and character as existed prior to such appropriation or taking. Thereafter, Rent shall be adjusted on an equitable basis, taking into account the relative value of the portion taken as compared to the portion remaining. For the purpose of this Article, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain.

## ARTICLE 13
## LIENS

13.1    <u>Liens</u>. TENANT hereby acknowledges that the interest of LANDLORD in the Premises shall not be subject to liens for improvements made by TENANT. In confirmation of the foregoing, nothing contained in this Lease shall be construed as a consent on the part of LANDLORD to liability under the construction lien law of the State of Florida, it being expressly understood that LANDLORD's estate shall not be subject to such liability. TENANT shall strictly comply with the construction lien law of the State of Florida. In the event that a claim of lien is filed against the property in connection with any work performed by or on behalf of TENANT, TENANT shall satisfy such claim, or shall transfer the same to security, within fifteen (15) days from the date of filing. In the event that TENANT fails to satisfy or transfer such claim within said fifteen (15) day period, LANDLORD may do so and thereafter charge TENANT, as Additional Rent, all costs incurred by LANDLORD in connection with satisfaction or transfer of such claim, including all its attorneys' fees. Further, TENANT agrees to indemnify, defend and hold LANDLORD harmless from and against any damage or loss incurred by LANDLORD as a result of any such claims of lien. If so requested by LANDLORD, TENANT shall execute a short form or memorandum of this Lease, which may, in LANDLORD's discretion be recorded in the Public Records for the purpose of protecting LANDLORD's estate from claims of lien, as provided in <u>Florida Statutes</u>. In the event such short form or memorandum of lease is executed, TENANT shall simultaneously execute and deliver to LANDLORD an instrument terminating TENANT's interest in the real property upon which the Premises is located which instrument may be recorded by LANDLORD at the expiration of the Lease Term, or such earlier termination hereof. This paragraph shall survive the expiration of the Lease Term or the earlier termination of this Lease.

14



**13.2**   In accordance with the applicable provisions of the Florida Construction Lien Law and specifically §713.10, Florida Statutes, (as may be amended from time to time) no interest of the LANDLORD in the Premises or in the underlying land shall be subject to liens for improvements made by TENANT, and TENANT shall notify any contractors, suppliers, materialmen, subcontractors and other persons working on such improvements of this provision.  TENANT hereby authorizes LANDLORD to prepare and record, (as set forth above) in the Public Records of Monroe County, Florida, a summary hereof which sets forth the provisions contained herein regarding the limitation on the liability of the LANDLORD and the Premises for such claims, making the LANDLORD as his attorney-in-fact for purposes of executing any such summary (Memorandum of Lease) on behalf of the TENANT but excluding the financial provisions of this Lease.

**ARTICLE 14**
**DEFAULT**

**14.1**   Events of Default.  The occurrence of anyone or more of the following events shall constitute an "Event of Default" and breach of this Lease by TENANT:

(a)   If TENANT fails to pay Rent, Additional Rent or any other additional rent or other charge required to be paid by TENANT under this Lease; or

(b)   If TENANT fails to promptly and fully perform any other covenant, condition, rule, regulation or agreement contained in this Lease or perform within the time periods set forth in this Lease and such failure continues for fifteen (15) days; or

(c)   If a writ of attachment or execution is levied on this Lease or on any of TENANT's or any Guarantor's property; or

(d)   If TENANT or any Guarantor makes a general assignment for the benefit of creditors, or provides for an arrangement, composition, extension or adjustment with its creditors or is generally insolvent or unable to pay its obligations as they come due; or

(e)   If TENANT or any Guarantor files a voluntary petition for relief or if a petition against TENANT or any Guarantor in proceeding under the federal bankruptcy laws or other insolvency laws is filed and not withdrawn or dismissed within thirty (30) days thereafter, or if under the provisions of any law providing for reorganization or winding up of corporations, any court of competent jurisdiction assumes jurisdiction, custody or control of TENANT or any Guarantor or any substantial part of their property and such jurisdiction, custody or control remains in force unrelinquished, unstayed or unterminated for a period of thirty (30) days or if TENANT or any Guarantor is adjudged a bankrupt; or,

(f)   If in any proceeding or action in which TENANT or any Guarantor is a party, a trustee, receiver, agent or custodian is appointed to take charge of the Premises, or TENANT's or any Guarantor's property (or has the authority to do so) for the purpose of enforcing a lien against the Premises or TENANT's or any Guarantor's property; or

(g)   If LANDLORD discovers that any financial statement delivered to LANDLORD by TENANT or any guarantor is false; or

(h)   In the event TENANT removes, attempts to remove, or permits to be removed from the Premises, except in the usual course of trade, the goods, furniture, effects or other property of TENANT brought thereon; or

(i)   In the event TENANT, before the expiration of said Lease Term, and without the written consent of LANDLORD, vacates the Premises or abandons the possession thereof, or uses the same for purposes other than the purposes for which the same are hereby leased, or ceases to use the Premises for the purposes herein expressed; or

(j)   In the event an execution or other legal process is levied upon the goods, furniture, effects or other property of TENANT brought on said Premises, or upon the interest of TENANT in this Lease, and the same is not satisfied within ten (10) days from such levy.

15



14.2    <u>LANDLORD's Remedies</u>. If any Event of Default occurs, then, LANDLORD shall have the following options, without further notice or demand of any kind:

(a)    <u>Option 1</u>. Sue for Rents as they become due; or

(b)    <u>Option 2</u>. (1) Terminate this Lease; (2) Resume possession of the Premises (together with all additions, alternations, fixtures and improvements thereto) for its own account; and (3) Recover immediately from TENANT any and all sums and damages for violation of TENANT's obligations hereunder in existence or due at the time of termination and damages for TENANT's default in an amount equal to the difference between the Rent for which provision is made in this Lease and fair rental value of the Premises for the remainder of the Lease Term, together with all other charges, rental payments, costs and expenses herein agreed to be paid by TENANT which include, but are not limited to, all costs and expenses of LANDLORD in connection with any attempts to re-lease or relet the Premises (including, but not limited to, broker's fees, advertising costs and cleaning expenses), the costs of recovering the Premises, and the costs of repairs and renovations reasonably necessary in connection with any releasing or reletting; or

(c)    <u>Option 3</u>.    Accelerate the whole or any part of Rent, Additional Rent and Operating Costs for the entire unexpired balance of the Lease Term, as well as all other charges, payments, costs and expenses to be paid by TENANT hereunder, including but not limited to damages for violation of TENANT's obligations hereunder in existence at the time of acceleration, so that all sums due and payable under this Lease will be treated as payable in advance on the date of acceleration and this Lease will remain in effect. For the purposes of determining the amounts due upon acceleration, the total amount so accelerated will be reduced to present value (using an assumed interest rate of 8%); or

(d)    <u>Option 4</u>.    (1) Resume possession; (2) Re-lease or re-rent the Premises for the remainder of the Lease Term for the account of TENANT; (3) Recover from TENANT at the end of the Lease Term or at the time each payment of Rent becomes due under this Lease (adjusted to present value using an assumed interest rate of 8%), as LANDLORD may elect, the difference between the rent for which provision is made in this Lease and the rent received on the re-leasing or re-renting, together with all costs and expenses of LANDLORD in connection with such re-leasing or re-rental, the collection of rent and the cost of all repairs or renovations reasonably necessary in connection with the re-leasing or re-rental for the purpose of such reletting, LANDLORD is authorized to decorate, to make any repairs to the Premises and/or to subdivide or restructure the Premises as LANDLORD see fit ("<u>Tenancy Repairs and Modifications</u>"). Further, LANDLORD is authorized to enter into new leases in which the Lease Term or other terms and conditions are different from this Lease ("<u>Lease Modification</u>"). Concerning any Tenancy Repairs and Modifications and any Lease Modifications, TENANT agrees that such Tenancy Repairs and Modifications and Lease Modifications are being performed for the purpose of reletting and mitigating TENANT's damages, and, as such are done for the benefit of the TENANT and are valid costs of reletting; and (4) Recover from TENANT immediately any other damages occasioned by or resulting from the abandonment or a breach or default other than a default in the payment of rent; or

(e)    <u>Option 5</u>. Without terminating this Lease, enter upon the Premises, without being liable for prosecution or any claim for damages therefore (whether caused by the negligence of LANDLORD or otherwise), and do whatever TENANT is obligated to do under the terms of this Lease, in which event TENANT shall reimburse LANDLORD on demand for any expenses which LANDLORD may incur in thus effecting compliance with the terms of this Lease.

(f)    Notwithstanding the foregoing, with respect to re-leasing or re-renting the Premises, LANDLORD and TENANT agree that LANDLORD shall only be required to use the same efforts LANDLORD then uses to lease other properties LANDLORD owns or manages; provided, however, that LANDLORD shall not be required to give any preference or priority to the showing or leasing of the Premises over any other space that LANDLORD may be leasing or have available and may place a suitable prospective TENANT in any such available space regardless of when such alternative space becomes available; provided, further, that LANDLORD shall not be required to observe any instruction given by TENANT about such re-letting or accept any TENANT unless such offered

16



TENANT has a credit worthiness acceptable to LANDLORD, leases the entire Premises, agrees to use the Premises in a manner consistent with the Lease, and leases the Premises at the same or greater rent, for no more than the current Lease Term, on the same terms and conditions of this Lease, and does not require an expenditure by LANDLORD for TENANT improvements or broker's commissions.

14.3    Remedies Non-Cumulative.  The remedies given to LANDLORD in this Article shall be in addition and supplemental to all other rights of remedies which LANDLORD may have under law or in equity.

14.4    Non-Waiver.  The waiver by LANDLORD of any breach of any term, covenant or condition of this Lease shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition.  The subsequent acceptance of Rent by LANDLORD shall not be deemed to be a waiver of any preceding breach by TENANT of any term, covenant or condition of this Lease other than the failure of TENANT to pay the Rent so accepted, regardless of LANDLORD's knowledge of such preceding breach at the time of acceptance of such rent.  No covenants, term or condition of this Lease shall be deemed to have been waived by LANDLORD unless such waiver is in writing signed by LANDLORD.

14.5    Rent Payments Under Default.  In the event of a default of any Rent payment or any other payment due under this Lease, LANDLORD may in LANDLORD's notice to TENANT of such default require TENANT's payment to cure the default be in cash, cashier's check, and/or certified check.  LANDLORD and TENANT agree that should LANDLORD so elect to require payment by cash, cashier's check or certified check in LANDLORD's notice to TENANT, a tender of money to cure the default, which is not in the form requested by LANDLORD, shall be deemed a failure to cure the default.  Nothing contained in this paragraph shall in any way diminish or be construed as waiving any of LANDLORD's other remedies as provided elsewhere in this Lease, or by law or in equity.

14.6    Expenses of Enforcement.  In the event any payment due LANDLORD under this Lease shall not be paid on the due date, said payment shall bear interest at Eighteen Percent (18%) from the due date until paid unless otherwise specifically provided herein, but the payment of such interest shall not excuse or cure any default by TENANT under this Lease.  In the event that it shall be necessary for LANDLORD to give more than (1) written notice to TENANT of any violation of this Lease, LANDLORD shall be entitled to make an administrative charge to TENANT of Two Hundred Fifty No/100 Dollars ($250.00) for each such notice.  TENANT recognizes and agrees that the charge which LANDLORD is entitled to make upon the conditions stated in this paragraph represent, at the time this Lease is made, a fair and reasonable estimate and liquidation of the costs of LANDLORD in the administration of the Premises resulting from the events described, which costs are not contemplated or included in any other rental or charges provided to be paid by TENANT to LANDLORD in this Lease.  Any charges becoming due under this paragraph of this Lease shall be added and become due with the next ensuing monthly payment of Rent and shall be collectible as a part thereof.

## ARTICLE 15
## SECURITY DEPOSIT

15.1    Amount of Deposit.  TENANT shall be required to post with LANDLORD a Security Deposit in the amount of Sixty-Seven Thousand Four Hundred Thirty Dollars ($67,430.00), to be paid in two installments, as required by paragraph 1.14 hereof.  The Security Deposit shall be subject to the contingencies as set forth in paragraph 15.2, below.  The Security Deposit shall serve as security for the prompt, full and faithful performance by TENANT of the terms and provisions of this Lease and not as an advance rent deposit or a measure of LANDLORD's damages in the case of TENANT's default.  In the event that there is an Event of Default hereunder or in the event that TENANT owes any amounts to LANDLORD upon the expiration of the Lease Term, LANDLORD may use or apply the whole or any part of the Security Deposit for the payment of TENANT's obligations hereunder.  The use or application of the Security Deposit or any portion thereof shall be at LANDLORD's option and shall not prevent LANDLORD from exercising any other right or remedy provided hereunder or under any Law and shall not be construed as liquidated damages.  In the event the Security Deposit is reduced by such use or



application, TENANT shall deposit with LANDLORD within ten (10) days after written notice, an amount sufficient to restore the full amount of the Security Deposit. LANDLORD shall not be required to keep the Security Deposit separate from LANDLORD's general funds or pay interest on the Security Deposit. Any remaining portion of the Security Deposit shall be returned to TENANT within sixty (60) days after the expiration of the Lease Term. LANDLORD may deliver the Security Deposit to any purchaser of or successor to LANDLORD's interest in this Lease or the Premises, and thereupon LANDLORD shall be discharged from all liability with respect to the Security Deposit.

15.2    Additional Deposit.    In the event LANDLORD posts a Three-Day Notice for failure to pay rent two (2) times during any six (6) month calendar period, then in that event TENANT will be required to pay an addition sum towards the security deposit in the amount of ONE MONTH'S RENT. That amount would be deemed "Additional Rent" per the Lease terms and shall be due in full when the next monthly rental installment becomes due. For the purposes of this paragraph, "one month's rent" shall meant one month's rent for the lease year in which the second Three-Day Notice is posted.

15.3    Guarantee.    In addition to the foregoing, JOHN A. DURAN (the "Guarantor") shall personally guarantee all obligations of TENANT contained within this Lease. Simultaneously with the execution hereof, the Guarantor shall execute a formal Guaranty of this Lease. The Guaranty shall be limited to an amount equal to six (6) months' Rent, including Additional Rent. Provided that there have been no late payments or other defaults in the terms of this Lease, the Guaranty will be released on the first day of the Fourth Lease Year.

## ARTICLE 16
## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT

16.1    Subordination by Tenant.    TENANT hereby subordinates its rights hereunder to the lien of any mortgage or mortgages or the lien resulting from any other method of financing or refinancing, now or hereafter in force against the Premises and to all advances made or hereafter to be made upon the security thereof. This shall be self-operative and no further instrument of subordination shall be required by any Mortgagee. However, TENANT, upon request of any party in interest, shall execute promptly such instrument or certificates to carry out the intent hereof as shall be required by LANDLORD. TENANT hereby irrevocably appoints LANDLORD as Attorney in Fact for TENANT, with full power and authority to execute and deliver, in the name of TENANT, any such instrument or certificates.

16.2    Estoppel Certificate.    Within ten (10) days after request by LANDLORD, or in the event that upon any sale, assignment or hypothecation of the Premises and/or the land thereunder by LANDLORD an estoppel certificate shall be required from TENANT, TENANT agrees to deliver, in recordable form, an estoppel certificate to any proposed mortgagee or purchaser or to LANDLORD certifying (if such be the case) that this Lease is in full force and effect and that there are no defenses or offsets thereon or stating those claimed by TENANT.

16.3    Attornment.    TENANT shall, in the event of a sale or assignment of LANDLORD's interest in whole or in part in the Premises, or if the Premises or such building comes into the hands of a mortgagee, ground lessor or any other person, whether because of a mortgage foreclosure, exercise of a power of sale under a mortgage, termination of the ground lease or otherwise, attorn to the purchaser or such mortgagee or other person and recognize the same as LANDLORD hereunder. TENANT shall execute, at LANDLORD's request, any attornment agreement required by any mortgagee, ground lessor or other such person to be executed, containing such provisions as such mortgagee, ground lessor or other person requires.

16.4    Financing Agreements.    TENANT shall not enter into, execute or deliver any financing agreement that can be considered as a priority to any mortgage or deed of trust that LANDLORD may have placed upon the Premises.

18



16.5    Non-disturbance by Landlord.    The LANDLORD shall obtain for the benefit of the TENANT a non-disturbance agreement from any Mortgagee, which agreement shall be on such Mortgagee's standard form and shall provide that in the event of a foreclosure or deed in lieu thereof, the tenancy of the TENANT shall not be disturbed.

## ARTICLE 17
## LIABILITY AND INDEMNITY

17.1    Limitations of LANDLORD's Liability; Indemnity.    LANDLORD shall not be liable or in any way responsible to TENANT or any other person for any loss, injury or damage suffered by TENANT or others in respect of (a) property of TENANT or others that is stolen or damaged, (b) injury or damage to persons or property resulting from fire, explosion, falling plaster, escaping liquid or gas, electricity, water, rain or leaks from any part of the Premises or from any pipes, appliances or plumbing work therein, or from dampness, (c) damage caused by other TENANT's, occupants or persons in the Premises, or the public, or caused by operations in the construction of any private or public work, (d) loss or damage, however caused, other than loss or damage directly caused by fault of LANDLORD and which is not otherwise excluded by the provisions of this paragraph. TENANT shall look solely to the estate and property of LANDLORD in the land and building comprising the Premises for the collection of any judgment, or in connection with any other judicial process, requiring the payment of money by LANDLORD in the event of any default or breach by LANDLORD with respect to any of the terms, covenants and conditions of this Lease to be observed and performed by LANDLORD and no other property or estates of LANDLORD shall be subject to levy, execution or other enforcement procedures for the satisfaction of TENANT's remedies and rights under this Lease.

17.2    TENANT'S Indemnity of Landlord.    TENANT shall indemnify and hold harmless LANDLORD against any and all damages or expenses arising out of or in connection with any accident or other occurrence on or about the Premises, and from all costs, liabilities, claims, charges, injuries, damages or expenses, including, without limitation, attorneys' or other professionals' fees and court costs, due to, arising out of or in connection with loss of life, personal injury, damage to property or any work done by, or act or omission of TENANT or its officers, partners, agents, servants, employees, customers, contractors, invitees, concessionaires or licensees in and about the Premises, or due to, arising out of or in connection with TENANT's use or occupancy of the Premises or any breach by TENANT of any provision of this Lease. In case LANDLORD shall be made a party to any litigation commenced by or against TENANT, then TENANT shall protect and hold LANDLORD harmless and pay all cost and attorneys' fees incurred by LANDLORD in connection with such litigation, and any appeals thereof.

17.3    Landlord's Indemnity of Tenant.    LANDLORD hereby agrees for itself and its successors and assigns to indemnify, defend and save the TENANT harmless from and against any liability or claims of liability arising solely out of the negligence or intentional acts and omissions of the LANDLORD, its agents or employees (i) in connection with the conduct, operations or management of the Premises; (ii) any work done on the Premises during the term; (iii) any breach or default in the performance of the obligations under the provisions of this lease and/or applicable law during the term of this lease; (iv) causing a tortuous claim; or (vi) any death or injury to any person or any damage to any property on or about the Premises.

## ARTICLE 18
## WASTE, ENVIRONMENTAL, GOVERNMENTAL REGULATIONS

18.1    Waste or Nuisance.    TENANT shall not commit or suffer to be committed any waste upon the Premises, or which may adversely affect LANDLORD's fee interest in the Premises.

18.2    Environmental Provisions.    TENANT agrees to comply strictly and in all respects with the requirements of any and all federal, state and local statutes, rules and regulations now or hereinafter existing relating to the discharge, spillage, storage, uncontrolled loss, seepage, filtration, disposal, removal or use of hazardous materials, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act,

19



the Resource conversation and Recovery Act, the Hazardous Materials Transportation Act and the Florida Hazardous Substances Law (collectively the "Hazardous Waste Law") and with all similar applicable laws and regulations. TENANT shall notify LANDLORD promptly in the event of any discharge, spillage, uncontrolled loss, seepage or filtration of oil, petroleum, chemical liquids or solids, liquid or gaseous products or any other Hazardous Materials (a "Spill") or the presence of any substance or material presently or hereafter identified to be toxic or hazardous according to any Hazardous Waste Law, including without limitation, any asbestos, PCBs, radioactive substance, methane, volatile hydrocarbons, acids, pesticides, paints, petroleum based products, lead, cyanide, DDT, printing inks, industrial solvents or any other material or substance which has in the past or could presently or at any time in the future cause or constitute a health, safety or other environmental hazard to any person or property (collectively "Hazardous Materials") upon the Premises. TENANT shall promptly forward to LANDLORD copies of all orders, notices, permits, applications or other communications and reports, notices, permits, applications or other communications and reports in connection with any such Spill or Hazardous Materials. TENANT shall not handle, use, generate, manufacture, store or dispose of hazardous Materials in, upon, under or about the Premises. TENANT shall indemnify LANDLORD and hold LANDLORD harmless from and against all loss, penalty, liability, damage and expense suffered or incurred by LANDLORD related to or arising out of the presence of Hazardous Materials on the Premises; which loss, damage, penalty, liability, damage and expense shall include, but not be limited to (1) court costs, attorney's fees and expenses, and disbursements through and including any appellate proceedings; (2) All foreseeable and unforeseeable consequential damages, directly or indirectly, arising out of the use, generation, storage or disposal of Hazardous Materials by TENANT; (3) The cost of any required or necessary repair, clean-up or detoxification of the Premises; and (4) The costs of preparation of any closure or other plans required under the Hazardous Waste Law, necessary to sell or lease the Premises.

## ARTICLE 19
## MISCELLANEOUS

19.1    <u>First-Class Operation</u>. TENANT covenants and agrees that at all times the business to be conducted at, through and from the Premises and the kind and quality of services to be offered in the conduct thereof will be first-class in every respect.

19.2    <u>Accord and Satisfaction</u>. LANDLORD is entitled to accept, receive and cash or deposit any payment made by TENANT for any reason or purpose or in any amount whatsoever and apply such payment at LANDLORD's option to any obligation of TENANT; any such payment shall not constitute payment of any amount owed except that to which LANDLORD has applied it. No endorsement or statement on any check or letter of TENANT shall be deemed an accord and satisfaction or otherwise recognized for any purpose whatsoever. The acceptance of any such check or payment shall be without prejudice to LANDLORD's right to recover any and all amounts owed by TENANT and LANDLORD's right to pursue any other available remedy.

19.3    <u>Attorneys' Fees</u>. In the event that it shall become necessary for LANDLORD to collect any sums due to it under this Lease or to employ the services of an attorney to enforce any of its rights under this Lease or to remedy the breach of any covenant of this Lease on the part of TENANT to be kept or performed, regardless of whether suit be brought or not, TENANT shall pay to LANDLORD such reasonable fee as shall be charged by LANDLORD's attorney or collection agency for such services, and any and all other costs incurred by LANDLORD in connection with the foregoing. Should suit be brought for the recovery of possession of the Premises, or for rent or any other sum due LANDLORD under this Lease, or because of the breach of any of TENANT's covenants under this Lease, or to interpret any provision of this Lease, TENANT shall pay to LANDLORD all expenses of such suit and any appeal thereof, including any reasonable attorneys' and paraprofessional fees and costs, through and including all trial and appellate levels and post-judgment proceedings.

20



19.4    Entire Agreement.  It is understood and agreed by TENANT that LANDLORD and LANDLORD's agents have made no representations or promises with respect to the Premises or this Lease, except as expressly set forth in this Lease, and that no claim or liability or cause for termination shall be asserted by TENANT against LANDLORD for, and LANDLORD shall not be liable by reason of, the breach of any representations or promises not expressly stated in this Lease. This Lease supersedes all prior agreements, written or verbal, with respect to the Premises, including, without limitation, any letter of intent.

19.5    Interpretation.  The parties agree that it is their intention to create only the relationship of LANDLORD and TENANT, and no provision hereof or act of either party shall be construed as creating the relationship of principal and agent, or a partnership, joint venture or enterprise between the parties. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement

19.6    Force Majeure.  If either party shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor trouble, inability to procure material, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under this Lease, the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.  Notwithstanding the foregoing, the provisions of this paragraph shall at no time operate to excuse TENANT from any obligations for payment of Rent, Additional Rent, or any other payments required by the terms of this Lease when due, and all such amounts shall be paid when due.

19.7    Notices.  All notices from TENANT to LANDLORD required or permitted by any provision of this Lease shall be directed to LANDLORD by certified mail, return receipt requested, at the address set forth in Paragraph 1.2 hereof or at such other address as LANDLORD may designate by written notice. All notices from LANDLORD to TENANT required or permitted shall be directed to TENANT by certified mail postage prepaid, hand delivery or by Federal Express or other nationally recognized overnight courier service at the address set forth in Paragraph 1.5 hereof or at such other address as TENANT may designate by written notice; or by posting on the Premises.  Notice given as described above shall be sufficient service and shall be deemed given as of the date received as evidenced by the return receipt of the registered or certified mail or the refusal of acceptance of such notice or after three (3) business day if any hand delivery or overnight courier service.

19.8    Captions and Section Numbers.  This Lease shall be construed without reference to titles of articles and paragraphs, which are inserted only for the convenience of reference.

19.9    Number and Gender.  The use herein of a singular term shall include the plural and use of the masculine, feminine or neuter genders shall include all others.

19.10    Intentionally Deleted.

19.11    Partial Invalidity.  If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

19.12    Recording.  LANDLORD shall record a Memorandum (short form) of this Lease, in order to provide public notice to any Contractor, Supplier, Materialmen, etc., of TENANT that such Contractor will not have any lien rights to the real property underlying the Premises. See paragraphs 13.1 and 13.2, above.

21

19.13  Governing Law.  This Lease shall be governed exclusively by the provisions hereof and by the laws of the State of Florida.  Venue for any action arising out of this Lease to enforce or interpret its terms or conditions shall be in Broward County, Florida.

19.14  Provisions Binding.  Except as otherwise expressly provided, the terms of this Lease shall be binding upon and shall insure to the benefit of the successors, legal representations and assigns, respectively, of LANDLORD and TENANT;  Each term and each provision of this Lease to be performed by TENANT shall be construed to be both a covenant and a condition.  The reference contained to successors and assigns of TENANT is not intended to constitute a consent to assignment by TENANT that is controlled by the provisions of Paragraph 9.1.

19.15  CONDITIONS PRECEDENT TO LEASE.  Anything contained elsewhere to the contrary notwithstanding, this Lease is subject to the following conditions precedent:

(a)  This Lease is subject to TENANT obtaining approval for its proposed use from the City of Weston and from Meridian Business Campus at Weston, Inc. on or prior to the Commencement Date.  TENANT shall make application for such approval within three days after the Effective Date hereof, and shall diligently pursue obtaining same.  In the event that the TENANT does not obtain such approval on or prior to the Commencement Date, this Lease shall be automatically deemed void ab initio and of no effect, and LANDLORD shall return any prepaid rent to TENANT.

(b)  This Lease is subject to TENANT conducting an investigation of the building structure, roof, and HVAC, and notifying LANDLORD of any objections to the same and any requested repairs, in writing, within ten (10) days after the date of execution of this Lease by TENANT.  Failure by TENANT to give such Notice to LANDLORD within such seven days shall be deemed an acceptance of the building's structure, roof, and HVAC, all in their "as is" condition and shall constitute an acknowledgement that the same are in good working order LANDLORD shall then have ten (10) days in which to either cancel this Lease and return any prepaid rent to TENANT, or to agree to make any repairs requested by TENANT in TENANT's Notice.  Failure of LANDLORD to respond to the TENANT's Notice within such period shall be deemed to be an automatic cancellation of this Lease.

In the event LANDLORD agrees to make any such repairs, then TENANT shall have thirty (30) days following receipt of notice from LANDLORD that such repairs have been completed ("notice of completion of repairs"), to give LANDLORD written notice of any defects in the repairs; LANDLORD shall then remedy any such defects in the repairs, at LANDLORD's sole expense.  Commencing with the 31st day following receipt by TENANT of the notice of completion of repairs, TENANT shall be solely responsible for maintenance and repairs to all items within the scope of this paragraph (excepting the LANDLORD's obligation to complete any remedies to defects in repairs of items for which notice was given to LANDLORD within the 30 days set forth above), at TENANT's sole expense.

(c)  This Lease is subject to LANDLORD conducting a radon test of the Premises within ten (10) days after the Effective Date of this Lease.  In the event said test reflects any required remediation, LANDLORD may, at LANDLORD's sole option, complete such remediation at LANDLORD's cost and expense, or elect to terminate this Lease and return any prepaid rent to TENANT.

(d)  This Lease is subject to TENANT obtaining financing for the tenant improvements on or prior to the Commencement Date.  In the event that the TENANT does not obtain financing approval on or prior to the Commencement Date, this Lease shall be automatically cancelled and of no further effect and LANDLORD shall return any prepaid rent to TENANT.

22



19.16  Amendments or Modifications.  No amendment or modification of this Lease or any consents or permissions of LANDLORD required under this Lease shall be valid or binding unless reduced to writing and executed by the party against whom enforcement is sought.

19.17  Easements. · LANDLORD reserves the right to grant any easements on, over, under and above the property on which the Premises is located for such purposes as LANDLORD determines in its sole discretion, provided that such easement will not materially adversely interfere with TENANT's business.

19.18  Financial Statement.  TENANT, all Members and/or Principals of TENANT, and Guarantors of TENANT's obligations under this Lease shall deliver to LANDLORD their most recent financial statements or any other financial information requested by LANDLORD, including, without limitation, statements of income and expense and statements of net worth and their sales tax reports for the period covered by the financial statement, prior to the execution of this Lease. All such information that LANDLORD may request shall be certified as being true and correct. In the event of a Disposition, any proposed new TENANT or Member/Principal of TENANT shall comply with the requirements of this Paragraph upon application to LANDLORD for approval of said Disposition.

19.19  Right of Entry.  LANDLORD and LANDLORD's agents shall have the right to enter the Premises at all times to examine the same, and to show them to prospective purchasers or lessees of the. Premises, and to make such repairs, maintenance, servicing, alterations, improvements or additions as LANDLORD may deem necessary or desirable, and LANDLORD shall be allowed to take all material into and upon the Premises that may be required therefore without the same constituting an eviction of TENANT in whole or in part and the Rent reserved shall not abate while said repairs, alterations, improvements, or additions are being made.  Notwithstanding the foregoing, except in case of emergency, LANDLORD shall provide TENANT with at least 24 Hours' advance notice intent to enter the Premises.  In case of emergency only, LANDLORD may enter the Premises without notice.  During the six (6) months prior to the expiration of the Lease Term, LANDLORD may show the Premises to prospective lessees, and place upon the Premises the usual notice "To Let" or "To Rent", or similar signs, which signs TENANT shall permit to remain thereon without molestation.  At any time during the Lease Term, LANDLORD may show the Premises to prospective purchasers and lenders, and may place upon the Premises "For Sale", or similar signs, which signs TENANT shall permit to remain thereon without molestation.  If TENANT shall not be personally present to open and permit entry into the Premises, at any time, when for any reason and entry therein shall be necessary or permissible, LANDLORD or LANDLORD's agents may enter the same without in any manner affecting the obligations and covenants of this Lease.  LANDLORD shall have the right, in any event, to constantly have keys to the Premises. Nothing herein contained, however, shall be deemed and construed to impose upon LANDLORD any obligations, responsibility or liability whatsoever, for the care, maintenance or repair of the building or any part thereof, except as otherwise herein specifically provided.

19.20  Joint and Several Liability.  If two or more individuals, corporations, partnerships or other business associations or any combination thereof shall sign this Lease as TENANT or as Guarantors, the liability of each such individual, corporation, partnership or other business association to pay rent and perform all other obligations under this Lease shall be deemed to be joint and several, and all notices, payments, and agreements given or made by, with or to any one of such individuals, corporations, partnerships or other business associations shall be deemed to have been given or made by, with or to all of them.

19.21  No Discrimination.  TENANT will not discriminate in the conduct and operation of its business in the Premises against any person or group of persons, including, but not limited to, because of the race, handicap, creed, sexual orientation, color, sex, national origin or ancestry of such person or group of persons.

19.22  Time of Essence.  Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

23



19.23 <u>WAIVER OF A JURY TRIAL</u>. EXCEPT AS PROHIBITED BY LAW, LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LEASE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTION OF LANDLORD, TENANT OR ANY GUARANTOR. THIS WAIVER IS A MATERIAL INDUCEMENT FOR LANDLORD TO ENTER INTO THIS LEASE. IF THE SUBJECT MATTER OF ANY LITIGATION IS ONE IN WHICH THE WAIVER OF JURY TRIAL IS PROHIBITED, NEITHER LANDLORD NOR TENANT SHALL PRESENT AS A NON-COMPULSORY COUNTERCLAIM IN SUCH LITIGATION ANY CLAIM ARISING OUT OF THIS LEASE. FURTHERMORE, NEITHER LANDLORD NOR TENANT SHALL SEEK TO CONSOLIDATE ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY LITIGATION IN WHICH A JURY TRIAL CANNOT BE WAIVED.

19.24 <u>Radon Gas</u>. Radon is naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal state guidelines have been found in building in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

19.25 <u>Inspections</u>. The TENANT has inspected the Premises and accepts the same in "AS IS" condition. See paragraph 2.2, above.

19.26 <u>Intentionally Omitted</u>.

19.27 OPTION TO RENEW: TENANT may renew this Lease for two periods of five (5) years each, pursuant to the rental provisions of Paragraph 1.8, above. The First Option to renew shall be exercised by TENANT by delivering to LANDLORD a written notice of exercise of the Option to Renew, by certified mail, return receipt requested, no later than December 31, 2026. In the event that such notice is not received by LANDLORD on or before December 31, 2026, this Option to renew shall terminate automatically, and TENANT shall no longer have the right to renew this Lease. The Second Option to renew shall be contingent on TENANT exercising the First Option to Renew, and be exercised by TENANT by delivering to LANDLORD a written notice of exercise of the Second Option to Renew, by certified mail, return receipt requested, no later than December 31, 2031. In the event that such notice is not received by LANDLORD on or before December 31, 2031, this Second Option to renew shall terminate automatically, and TENANT shall no longer have the right to renew this Lease. In addition to the foregoing, it shall be a condition precedent to both Options that the TENANT shall not be in compliance with all of TENANT's obligations under this Lease at the time the Option is exercised by TENANT.

19.28 <u>BANKRUPTCY OF TENANT</u>. IN THE EVENT TENANT FILES ANY FORM OF BANKRUPTCY, LANDLORD SHALL BE ENTITLED TO IMMEDIATE TERMINATION OF THE AUTOMATIC STAY PROVISIONS OF 11 U.S.C. §352, GRANTING THE LANDLORD COMPLETE RELIEF AND ALLOWING THE LANDLORD TO EXERCISE ALL OF HIS LEGAL AND EQUITABLE RIGHTS AND REMEDIES, INCLUDING, WITHOUT LIMITATION, THE RIGHT TO TERMINATE THIS LEASE AND DISPOSSESS TENANT FROM THE DEMISED PREMISES IN ACCORDANCE WITH FLORIDA LAW. ADDITIONALLY, TENANT AGREES NOT TO DIRECTLY OR INDIRECTLY OPPOSE OR OTHERWISE DEFEND AGAINST THE LANDLORD'S EFFORT TO GAIN RELIEF FROM THE AUTOMATIC STAY. THE LANDLORD SHALL BE ENTITLED AS AFORESAID TO THE LIFTING OF THE AUTOMATIC STAY WITHOUT THE NECESSITY OF AN EVIDENTIARY HEARING



AND WITHOUT THE NECESSITY OR REQUIREMENT OF THE LANDLORD TO ESTABLISH OR PROVE THE VALUE OF THE LEASEHOLD, THE LACK OF ADEQUATE PROTECTION OF HIS INTEREST IN THE LEASEHOLD, OR THE LACK OF EQUITY IN THE SAME. TENANT SPECIFICALLY AGREES AND ACKNOWLEDGES THAT THE LIFTING OF THE AUTOMATIC STAY HEREUNDER BY THE APPROPRIATE BANKRUPTCY COURT SHALL BE DEEMED TO BE "FOR CAUSE" PURSUANT TO SECTION 362(D)(1).

THIS CLAUSE WAS A MATERIAL CONSIDERATION TO THE LANDLORD TO GIVE THIS LEASE, AND HAD THE TENANT NOT AGREED TO THIS PROVISION, THE LANDLORD WOULD NOT HAVE ENTERED INTO THIS LEASE.

19.29 **LEGAL REPRESENTATION.** TENANT acknowledges that it has been advised to retain its own counsel before execution of this Lease to represent it in this Lease transaction. After such opportunity and advisement, TENANT represents that it fully understands all the terms of this Lease; and, with this full understanding, voluntarily enters into this Lease as evidenced by the corporate officer's signature below.

19.30 Brokerage. EWM Commercial (the "Broker") is the only broker entitled to compensation in connection with this Lease and shall be compensated pursuant to that certain Commission Agreement entered into by and between Broker and LANDLORD.

19.31 Landlord's Exchange. Notwithstanding anything to the contrary in this Lease, TENANT hereby waives any right to obtain a money judgment or equitable relief against First American Exchange Company, LLC ("FAEC") and any and all members, shareholders, partners and employees of FAEC. The terms of this paragraph shall supersede any and all other terms and conditions herein.

SIGNATURES APPEAR ON THE FOLLOWING PAGES

25



IN WITNESS WHEREOF, LANDLORD has signed this Lease as of this 5 day of May, 2017.

WITNESSES:
(As to Landlord)

Print Name _Ashleigh Price_

Print Name _Richard Limb_

LANDLORD

Weston 3305 Property, LLC, a Florida limited liability company

By:  First American Exchange Company, LLC, a Delaware limited liability company, sole member and manager

By: _____
     Mark A. Bullock, Esq.
     Counsel and Manager

26

IN WITNESS WHEREOF, TENANT has signed this Lease as of this _25_ day of May, 2017.

WITNESSES:
(As to Tenant)

Print Name _Scott Eiser_

Print Name _Valerie Hassenti_

TENANT

Gecko Parks, LLC a Florida limited liability company

By: _____
JOHN A. DURAN, Member

27

Exhibit B

# C. DAVID TANGORA, P.A.

ATTORNEY AT LAW
200 SOUTHEAST 18TH COURT
FORT LAUDERDALE, FLORIDA 33316
EMAIL:TANGORALAW@BELLSOUTH.NET

TEL: (954) 779-1005

FAX: (954) 764-4502

BY EMAIL AND BY
FIRST CLASS US MAIL
moshe@moshelaw.com

November 2, 2018

Moshe Rubenstein, Esq.
MOSHE RUBENSTEIN LAW FIRM, P.A.
6100 Hollywood Blvd., Suite 305
Hollywood, FL 33024

> **Re:** **Weston 3305 Property, LLC**
> **Your letter dated October 3, 2018**
> **File No.: 18-153**

Dear Mr. Rubenstein:

My client, Gecko Parks, LLC, has requested that I reply to your letter dated October 3, 2018. Said letter demands that Gecko Parks, LLC ("Gecko Parks") assume financial responsibility pursuant to Weston 3305 Property, LLC's demand to repair the roof at the facility located at 3305 Corporate Avenue, Weston, FL 33331.

To my understanding, at no time while Gecko Parks was contemplating occupancy at the referenced address, and at any time after Gecko Parks was placed in possession, was the roof in a good condition. Contrary to the assertions in your letter, there were multiple leaks on the initial date that Gecko Parks took possession of the facility, and Gecko Parks confirms that the numerous roof leaks were reported to the Landlord immediately upon Gecko Parks taking possession of the facility. Said leaks have continued unabated, and in fact have increased in severity and location after Gecko Parks commenced occupancy at the address. My client asserts that the roof is aged, and there is a second roof membrane installed over the original roof layer, which causes damages to both roof membranes every time any person walks on the roof. Gecko Parks' Contractors and Subcontractors which worked on the roof universally assert that the roof was in poor condition when they performed work and at the time Gecko Parks took occupancy. These Subcontractors have offered to forward time-stamped photographs and/or videos to prove it

Pursuant to the Triple Net Commercial Lease executed by the parties "Landlord warrants that the roof is free of leaks as of the commencement date. Landlord shall be responsible for all repairs, maintenance and replacements to the roof..." Not only has the roof been determined to be aged, not free of leaks and in poor condition at the time of lease commencement, it appears that Landlord is improperly trying to shift a capital improvement for the building to the Tenant.

Moshe Rubenstein, Esq.
November 2, 2018
Page Two

Furthermore, in the event the various Subcontractors improving the property for Gecko Parks' operation of the facility, specifically the Electrical and HVAC Subcontractors, may have caused additional water intrusion through problems upon the roof, those entities will be contacted. We will also be in contact with those Subcontractors requesting them to put their insurance carriers on notice of any required damage and required repairs to the roof which would be attributable to the Subcontractors. However, due to the age and poor condition of the roof, it is likely that the responsibility to deliver an adequate roof membrane will rest with the landlord.

The HVAC units were properly installed, and passed City of Weston inspections accordingly. Contrary to your assertions on this subject, it was the fragility and the age of the roof which caused any water intrusion problems which the Landlord is now claiming damages for. If there is any existing roof warranty, Gecko Parks demands production of same. In addition, the record of the two (2) apparent roof installations are respectfully requested, to gauge the age of the two roof membranes, at the time Gecko Parks took possession of the facility.

Gecko Parks has had five (5) separate roofing companies inspect the existing roofing membrane. It is in no way immaculate or in good condition. The roofing contractors have reported that the existing roof needs replacement, because more than Twenty-Five percent (25%) of the roof surface requires replacement per the South Florida Building Code. The roofing contractors further advised that there is a roof surface installed on top of the original roof. They further contend that the new roofing surface on top of the original roof caused membrane punctures in the original roofing membrane.

Please be advised that as a result of the water intrusion, Gecko Parks has suffered substantial financial damages. Arcade games were completely destroyed by water intrusion, those games having a cost of $8500.00 and $6700.00, respectively. Gecko Parks has suffered business disruption and has not been able to use several of its party rooms; the arcade area has had to be closed; the parcours were closed; and damage has been occasioned to the tiles and the suspended ceiling in the facility. Furthermore, due to the water intrusion four (4) feet of sheet rock closest to the floors inside the facility were damaged and had to be replaced. Many of the floor boards also had to be replaced due to the leakage and water intrusion, incurring a cost of $2800.00. Gecko Parks had to shut down many of its attractions due to the water intrusion. Party Room No. 7 had to be closed every time it rained. Party Room No. 4 had to be shut down for a week or more due to a ceiling collapse attributable to the water intrusion. Party Room No. 7 has had to be shut down at least 19 times due to a leak from the existing rusted and leaking HVAC unit, which condition continues to exist as of today. The loss of revenue at Party Room No. 7 was $680.00 per party, times an average of four parties per day. Modifications had to be made to use other space. The damages attributable to the loss of Party Room No. 7 amount to $51,680.00. Party Room No. 4 was lost for a whole week when the ceiling fell down, resulting in lost revenue of $8160.00. The total loss on equipment, games, lost revenue and repairs total $126,090.00, and these damages are steadily increasing.

Furthermore, for a related expense at the facility, Gecko Parks has had to bear the expense of $7,800.00 to bring all external light fixtures into proper working condition. This is another responsibility

Moshe Rubenstein, Esq
November 2, 2018
Page Three

of the Landlord to deliver safe, secure and suitable premises to the Tenant.

My client will be providing me with a summary of all the damages suffered due to the water intrusion and other problems at the facility. We will provide them to your office and request that the Landlord assume liability and takes care of the expenses that Gecko Parks has had to bear due to the substandard roof condition at the facility.

Please do not hesitate to give me a call on the foregoing. I look forward to the prompt resolution of the claims suffered by Gecko Parks due to the water intrusion, as a result of the age and the sub-standard and worn out roofing membrane.

Yours very truly,

C. David Tangora

CDT/ar
cc: Gecko Parks, LLC

Exhibit C

Gecko Parx
2467 Provence Circle
Weston, FL  33327 US
john@geckoparx.com



# INVOICE

**BILL TO**
Weston 3305 Property, LLC
7860 Peters Road, F-104
Plantation, FL 33324

INVOICE #  1038
DATE  02/06/2019
DUE DATE  02/06/2019
TERMS  Due on receipt

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Business Disruption** Room 4- water damage due to roof leak and non-usage of Party Room 4 | 1 | 8,160.00 | 8,160.00T |
| **Business Disruption** Room 7-Continued water leak from Roof and HVAC unit- Has not fixed and ongoing issue $51,680 previous bill and new addition 6 more days | 26 | 2,750.00 | 71,500.00T |
| **Damage from Roof:Damage** Two arcade games were damage due to a leaky roof - $8500 and $6700 | 1 | 15,400.00 | 15,400.00T |
| **Structural damage** Invoiced by Contractor but was never paid.  Gecko ParX had to pay to release any lein. Damage of sheet rock from window(s) leaks | 1 | 2,800.00 | 2,800.00T |
| **External lights** External lights were replaced and fixed. | 1 | 7,800.00 | 7,800.00T |
| **Business Disruption** Ninja course shut down and trampoline shut down due to water damages | 1 | 38,000.00 | 38,000.00T |
| **Business Disruption** Women Bathroom  Games | 32 | 500.00 | 16,000.00T |
| **Structual damage** Roter Roter Plumming | 1 | 575.00 | 575.00T |
| **Structual damage** Murphy AC | 1 | 975.00 | 975.00T |
| **Structual damage** Broward Nelson - Checked Walk in | 1 | 120.00 | 120.00T |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| cooler and lines for Coke Machine | | | |
| Structual damage<br>Juan Garcia- Wall Repair | 1 | 625.00 | 625.00T |

Additional items on the structural damage. The HVAC in the package unit needs to be replaced. This is prior to commencement. This not a roof leak but an HVAC unit that was rusted out and your roofer Mr. White has informed you that we thought it was a roof leak but it ended up being an HVAC issue.  This need to be replaced.  Our daily rate is $2750  when we cannot use the room.

| SUBTOTAL | 161,955.00 |
|---|---|
| TAX | 10,843.25 |
| TOTAL | 172,798.25 |
| BALANCE DUE | **$172,798.25** |

Exhibit D

# INVOICE

**DATE**
June 11, 2020

**INVOICE NO**
1286

**GECKO PARX**
3305 Corporate Ave
Weston, Fl 33331
954-526-8180
John@geckoparx.com

**INVOICE TO: Weston 3305
Property, LLC**

**DUE DATE**
June 11, 2020

| QUANTITY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| 1 | Leaks in Foam Pit clean it | $900 | $900 |
| 4 crates | Foam Cube replacement | $4438 | $4438 |
| 1 | Tiles | 101.28 | 101.28 |
| 1 | Cleaning leaks | 150 | 150 |

| | |
|---|---|
| Subtotal | 5589.28 |
| Sales Tax | |
| Total | 5589.28 |